# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

EDGENET, INC.,

                    Plaintiff,

      v.                                           Case No. 09-CV-747

HOME DEPOT U.S.A., INC., and
JAMES MUSIAL.

                    Defendants.

_____

# ORDER

The ancient admonition "thou shalt not steal"[1] expresses a value that is basic to and underlies the law of property: one cannot freely appropriate to him or herself what has been produced by the labor, efforts, or capital of another. While the plaintiff, Edgenet, Inc. ("Edgenet"), did not formally allege that the defendants in this action, Home Depot U.S.A., Inc. ("Home Depot") and James Musial ("Musial"), contravened the seventh commandment, Edgenet has accused the defendants of violating nearly every modern derivation[2] of the biblical edict by misappropriating the plaintiff's product collection taxonomy, a system that organizes product data from Home Depot's suppliers and delivers that data to Home Depot. (Docket #1). The defendants have initially moved to dismiss the sole federal claim in the plaintiff's complaint, a copyright infringement cause of action, for a failure to state a claim

---

[1] Exodus, Chapter 20: Verse 15.

[2] The plaintiff's complaint alleges that Home Depot and Musial misappropriated Edgenet's trade secrets in violation of Wisconsin law. In addition, Edgenet brings six different claims against Home Depot alone, arising from federal copyright law, state contract law, state tort law, and state unfair competition law. (Docket #1).

upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), contending that Home Depot obtained a license to use the product collection taxonomy that forms the basis for Edgenet's copyright claim. (Docket #15). The defendants further contend that, if the court dismisses Edgenet's federal claim, the court should, in an exercise of discretion, dismiss the remaining state law claims. Having examined Edgenet's complaint and its relevant attachments, the briefs submitted by the parties, and the appropriate case law, the court will grant Home Depot's motion to dismiss.

## FACTUAL BACKGROUND

Before discussing the merits of the defendants' motion, a brief discussion of the facts animating this dispute is necessary. In ruling on a motion to dismiss under Rule 12(b)(6), the court must accept all well-pleaded plausible "allegations as true and [will] draw all reasonable inferences in favor of the plaintiff." *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008). Generally, a court must limit its review to the allegations in the complaint in deciding a Rule 12(b)(6) motion to dismiss. However, an exception to this rule exists for documents that are referred to in the complaint and that are central to the plaintiff's claim, as the court can consider those documents using the standards for deciding a motion to dismiss. *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009). If the plaintiff fails to attach such documents to the complaint, the defendant may submit them in support of his or her Rule 12(b)(6) motion. *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir.2002). As such, the court's recitation of the facts in this case are a product of the

complaint and the several contracts that are referenced in the pleadings in this case. *See Kennedy v. National Juvenile Detention Ass'n*, 187 F.3d 690, 694-95 (7th Cir. 1999).

The central defendant in this case, Home Depot, is the largest home-improvement retailer in the United States and the second-largest general retailer in the country, behind only Wal-Mart.   The Home Depot, Investor Relations, http://ir.homedepot.com/phoenix.zhtml?c=63646&p=irol-IRHome   (last visited January 12, 2010).  The home improvement giant's revenues exceeded 70 billion dollars in 2008, and the company boasts having more than 2,000 stores across North America, Puerto Rico, and China.  *Id.*  The bright orange Home Depot stores, familiar icons of American suburbia, are "full-service, warehouse style" retail outlets that average over 100,000 square feet in size and contain approximately 30,000 to 40,000 different kinds of building materials, home improvement supplies, appliances, and lawn and garden products.  The Home Depot, Stores, Products, and Services, http://corporate.homedepot.com/en_US/Corporate/Public_Relations/Online_ Press_Kit/Docs/Store_and_Services_Overview.pdf, (last visited January 12, 2010). Beyond what can be found at a given store, customers can special order  250,000 other items.  *Id.*  In addition, customers can purchase any of the products Home Depot offers for sale at its stores through homedepot.com, the defendant's online retail site. *Id.* From five foot tall lit "grapevine angels"[3] used to decorate one's house

---

[3]The Home Depot, Home Accents Holiday 5 Ft. Lighted PVC Grapevine Angel, http://www.homedepot.com/Decor-Holiday-Decorations/h_d1/N-1xr5Zbd6e/R-100686970/h_d2/ProductDisplay?langId=-1&storeId=10051&catalogId=10053 (last visited December 29, 2009).

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 3 of 33   Document 24

during the holiday season to simple cement cinder blocks,[4] Home Depot offers a staggering array of products for consumers to purchase through several different means.

For each of the thousands of products sold by Home Depot, the supplier of the product submits to the defendant marketing data containing detailed information about a given product, risking a potential information overload for the company. For example, marketing data regarding a screwdriver sold at the Home Depot might contain the height of the product, the type of grip the tool has, or the drive style for the screwdriver. Data about a refrigerator sold at the retail giant likely contains what type of door style the appliance has, the weight of the item, and whether the refrigerator contains an external ice dispenser. With each item that Home Depot offers for purchase, an avalanche of data amounts, presenting an enormous challenge to the home improvement behemoth as to how to maintain, organize, and utilize the product data for its competitive advantage.

To help overcome this challenge, in 2004 Home Depot contracted with the plaintiff Edgenet, an information technology provider, to collect data from the defendant's numerous suppliers and process that data for various uses including presenting and describing the products available for sale to customers on

---

[4]The Home Depot, 8 In. x 4 In. x 16 In. Heavy Weight Block, http://www.homedepot.com/Building-Materials-Concrete-Cement-Masonry-Concrete-Blocks/h_d1/N-5yc1vZ1xkkZaq78/R-100350682/h_d2/ProductDisplay?langId=-1&storeId=10051&catalogId=10053 (last visited January 12, 2010).

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 4 of 33   Document 24

homedepot.com.   In a May 5, 2004 "Content Services Agreement," Edgenet[5]
pledged to provide Home Depot with "services" including the "downloading,
assembling, reviewing, analyzing, aggregating, enhancing, formatting, enriching, and
organization" of "raw and unformatted data" provided by Home Depot's third party
suppliers.  In consideration for the plaintiff's services, Home Depot promised to pay
an initial fee of $49,513.00 for the "set up" of Edgenet's data system and separate
fees for each individual product added to Edgenet's collection of data.   The
agreement contemplated future agreements between the parties, called "Statements
of Work," which would further specify the services requested by the defendant of
Edgenet.  The contract also stated that Home Depot retained "all rights, title, and
interests" in the actual data provided by the third party suppliers.  The Content
Services Agreement contained a choice of law provision stating that the "laws of the
State of Delaware without regard to its conflicts of law principles" would govern the
interpretation of the contract.

To fulfill its obligations under the agreement, Edgenet developed the "Big
Hammer Master Collection Taxonomy and Attributes" ("product collection
taxonomy"), a system which organizes data by establishing hierarchies of product
categories and features and by arranging products according to the appropriate
categorization.   A tool such as a simple phillips-head screwdriver might be first
categorized as a "hand tool," and then further subcategorized under the title of

---

[5] The parties to the original Content Services Agreement were Home Depot and Big Hammer, LLC ("Big Hammer").  Edgenet acquired Big Hammer in 2006, assuming Big Hammer's rights and liabilities under the contract.  For simplicity's sake, the court will refer to Big Hammer as "Edgenet" in this order.

"screwdriver," and then grouped with other "manual screwdrivers." Further categorization would sort the screwdriver by its drive style. A supplier would submit product market information to the plaintiff who would, in turn, aided by the product collection taxonomy, review the data for errors, identify which category, subcategory, and item description properly fit the product, and format the data according to Home Depot's specifications. On December 12, 2008, Edgenet obtained a certificate of registration with the United States Copyright Office for its 2008 version of the product collection taxonomy "and attributes."[6]

The parties executed a "Statement of Work" on December 18, 2006 ("December 2006 Statement of Work" or "license agreement"), an amendment to the original Content Services Agreement, providing Home Depot with a "nonexclusive worldwide license" to Edgenet's product collection "taxonomies." The license grant provides that the license would be used "initially" for the "SAP Core Retail Project,"[7] but clarifies that Home Depot owns all "right, title, and interest" in the "display taxonomies." Section two of the agreement places restrictions on the nature of the license. Specifically, the December 2006 Statement of Work states in section 2A

---

[6] The Certificate of Copyright Registration indicates that the copyright claim excludes "text obtained from vendors," such as written descriptions of a particular product. As such, Edgenet's copyright protects its intellectual property rights in the hierarchal structure that the plaintiff created to organize data from Home Depot's suppliers.

[7] While not defined in the December 2006 Statement of Work, SAP is the name of a German-based software company. The SAP Core Retail Project refers to the efforts to integrate SAP's software system into Home Depot's computer system in Canada.

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 6 of 33   Document 24

that the license remained a "no cost license" only if Edgenet "continue[d] to be"[8]

Home Depot's "Retail Private Data Pool,[9] GDSN Data Pool[10] and Marketing Data

Pool[11] for the United States and Canadian stores."  However, the agreement further

provides that if Home Depot "ceases the relationship under 2A," that the defendant

would have the "option to license the product collection taxonomy perpetually and

make any modification or improvements" if it paid a "one time fee of $100,000" to

Edgenet.   Finally, the licensing agreement contains a cancellation clause that

provides if Home Depot opts to "terminate" the relationship with Edgenet described

under section 2A, and if Home Depot does not exercise its option to "purchase the

perpetual license" to the copyrighted product collection taxonomy, Home Depot must

"immediately":  (1) cease using the taxonomy; (2) destroy all copies of the taxonomy;

and (3) confirm to Edgenet that the defendant complied with the first and second

requirements.  The December 2006 Statement of Work adopts all of the provisions

of the original Contents Services Agreement, such as its choice of law clause, but

---

[8] Both parties agree that section 2A implicitly references the July 20, 2006 Statement of Work ("July 2006 Statement of Work") in which the parties agreed that Edgenet would be the "preferred provider" for Home Depot as the defendants' secondary data collection vendor.

[9] The terms "Retail Private Data Pool," "GDSN Data Pool," and "Marketing Data Pool" are not defined by the December 2006 Statement of Work.  However, the July 2006 Statement of Work defines a Retail Private Data Pool as the "data pool maintained for [Home Depot's] use."

[10] The July 2006 Statement of Work defines a "GDSN Data Pool" as the "Global Data Synchronization Network," a "network of data pools that aggregate generic item data from suppliers for retailer's use in a standardized format."

[11] No agreement defines what the phrase "Marketing Data Pool" means, but the July 20, 2006 Statement of Work does define the phrase "Hardlines Marketing Data Pool (HMDP)" to mean "generic marketing data" provided by third party suppliers that is not typically in the Retail Private Data Pool or the Global Data Synchronization Network's Data Pool.

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 7 of 33   Document 24

does state that the Statement of Work would "survive [the] termination of the [Content Services Agreement] for any reason."

Home Depot's relationship with Edgenet deteriorated in 2008. On January 23, 2008, Home Depot Canada, a separate legal entity from Home Depot U.S.A., Inc., notified suppliers that Home Depot Canada would no longer be using Edgenet for its data management and that all such efforts would be done internally by the defendant.[12]  In March of 2008, Edgenet provided Home Depot with detailed information about the plaintiff's data systems. Home Depot used the information to start building an internal data system called "HomeDepotLink."  In July of 2008, the retail giant hired James Musial, a co-defendant who was then employed at Edgenet as the software project manager on Home Depot's account. That fall, Home Depot, with Musial's guidance, continued to request and obtain information from Edgenet regarding the plaintiff's taxonomies. In November 2008, Edgenet raised concerns that Home Depot was misappropriating the plaintiff's trade secrets and copyright-protected taxonomy by decompiling and reverse engineering Edgenet's software. In a meeting on December 2, 2009, Home Depot revealed to Edgenet that the

---

[12] The plaintiff's complaint (Docket #1) makes no mention of the events occurring on January 23, 2008. The only discussion of the event by the plaintiff exists in a declaration by the Chief Technology and Data Officer for Edgenet that was attached the plaintiff's response to the motion to dismiss. (Docket #18). The declaration states that on January 23, 2008, Home Depot Canada *notified* its vendors that the services of Edgenet were no longer needed. Notably, the declaration does not indicate that Home Depot Canada actually *ceased* using Edgenet's services at that time. There is, of course, nothing wrong with the plaintiff adding to the facts made in the complaint via the affidavit. *See Hrubec v. Nat'l R.R. Passenger Corp.*, 981 F.2d 962, 963-64 (7th Cir. 1992) (holding that in responding to a motion to dismiss, "[a] plaintiff need not put all of the essential facts in the complaint . . . he [or she] may add them by affidavit or brief.") However, the court can only draw reasonable inferences from the plaintiff's assertions in the response brief and the corresponding declaration: the mere fact that Home Depot Canada notified its suppliers that it was internalizing the product data collection system does not mean that the defendant actually ceased using Edgenet's services at that time.

defendant was developing its own system to obviate the need for the plaintiff's services. In the weeks that followed, a series of fruitless discussions between Home Depot and Edgenet occurred in which the parties attempted to resolve their ever-escalating dispute. On December 16, 2008, Edgenet filed suit against Musial in a Wisconsin state court for a series of claims related to this dispute. However, Edgenet had not yet proceeded to file suit against Home Depot.

Two months later, on February 26, 2009, Home Depot presented Edgenet with a letter providing notice of Home Depot's termination of the Content Services Agreement. Home Depot also tendered a check in the amount of $100,000 in order to obtain a nonexclusive license to use Edgenet's product collection taxonomies per the December 2006 Statement of Work. However, on March 4, 2009, Edgenet returned Home Depot's check, rejecting the defendant's effort to purchase the license. In July of 2009, Home Depot informed its suppliers that it would stop accepting product data from Edgenet as of August 3, 2009, and, instead, Home Depot required suppliers to start using the defendant's in-house data collection and management system, HomeDepotLink.

Ultimately, the plaintiff filed this suit on July 31, 2009, alleging that Home Depot infringed Edgenet's copyright and asserting a host of state law claims against the defendants. (Docket #1). On September 29, 2009, the defendants moved to dismiss the plaintiff's complaint, arguing that Edgenet had granted Home Depot a perpetual license to use the product collection taxonomy underlying Edgenet's copyright claim. Home Depot further argues that if this court opts to dismiss

Edgenet's federal claim, the court should not exercise supplemental jurisdiction over the pendant state law claims. Finally, Home Depot contends that if the court does retain jurisdiction over the state law claims, that three of the claims should be dismissed. Having discussed the relevant facts propelling the defendants' motion to dismiss, the court will proceed to address the merits of the motion.

## DISCUSSION

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal, not factual, sufficiency of a complaint. *See Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-676 (7th Cir. 2001). As such, to survive a 12(b)(6) motion to dismiss, the plaintiff's complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949.

### A.    Copyright Infringement (Count I)

In this case, the defendants have initially moved to dismiss the plaintiff's first count in the complaint, a claim of copyright infringement of Edgenet's "Big Hammer Master Collection Taxonomy and Attributes 2008," the 2008 version of the product collection taxonomy, under 17 U.S.C.§ 501. To state a claim for copyright infringement, Edgenet needs to plead:  (1) ownership of a valid copyright; and (2) the

defendant's unauthorized copying of protected elements of the copyrighted material. *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) (internal citations omitted). By obtaining a certificate of registration from the United States Register of Copyrights for the taxonomy and attributes in 2008,[13] plaintiff established a rebuttable presumption in favor of the copyright's validity, 17 U.S.C. § 410(c); *see also Wildlife Express*, 18 F.3d at 507, and the defendants do not contest the validity of plaintiff's copyright in this motion. However, the defendants do take issue with the second element of the copyright infringement claim, arguing that Home Depot purchased a "nonexclusive license to use Edgenet's product collection taxonomy" via the December 2006 Statement of Work.[14]

The owner of a federal copyright is granted exclusive rights to do and authorize any of the following: (1) "to reproduce the copyrighted work"; (2) "to

---

[13] A copyright owner seeking to assert his or her copyright under federal law must register the copyright before commencing suit. The copyright owner can recover for pre-registration infringing acts, but can recover only actual damages (as opposed to statutory damages) for such conduct. 17 U.S.C. § 411 (a) and 412(1).

[14] The plaintiff argues that the defendants' motion to dismiss the copyright claim is not one predicated on the plaintiff's failure to state a claim. Instead, the plaintiff contends that the motion is for a ruling on an affirmative defense to the plaintiff's copyright claim, which is typically inappropriate for resolution at the pleading stage. *See Xechem, Inc. v. Bristol-Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004). Specifically, the plaintiff construes the defendant's motion to be an affirmative defense that the December 2006 Statement of Work provided a *license* allowing for the reproduction of and preparation of a derivative work based on the plaintiff's copyrighted taxonomy. However, no matter how the court construes the defendants' motion, whether it challenges the basic elements of the plaintiff's claim or raises an affirmative defense, the result is the same. While ordinarily "complaints do not have to anticipate affirmative defenses to survive a motion to dismiss," an exception to this general rule exists when the complaint itself sets "forth everything necessary to satisfy the affirmative defense." *United States v. Lewis,* 411 F.3d 838, 842 (7th Cir. 2005). Here, the exception to the general rule governs, as the plaintiff conceded in its complaint the existence of a license agreement between the two parties, merely contesting the legal validity of the agreement and the scope of the agreement. (Pl's Compl. ¶ 44). Moreover, the Seventh Circuit has found that a motion to dismiss pursuant to Rule 12(b)(6) is the appropriate vehicle for resolving a dispute regarding whether a nonexclusive license negates a claim of copyright infringement. *See Kennedy v. National Juvenile Detention Ass'n,* 187 F.3d 690 (7th Cir. 1999). Accordingly, the court proceeds to examine the legal merits of the defendants' arguments regarding the copyright claim.

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 11 of 33   Document 24

prepare derivative works based upon the copyrighted work"; (3) " to distribute copies

. . . of the copyrighted work to the public by sale or other transfer of ownership, or

by rental, lease, or lending"; (4) if applicable, "to perform the copyrighted work

publicly"; (5) if applicable, "to display the copyrighted work publicly"; (6) if applicable,

"to perform the copyrighted work publicly by means of digital audio transmission."

*N.Y. Times Co. v. Tasini*, 533 U.S. 483, 496 (2001) (quoting 17 U.S.C. § 106).  In

turn, a copyright owner can transfer to another party:  "(1) by exclusive license, one

or all or any part of its exclusive rights; or (2) by nonexclusive license, permission 'to

exploit any one or more of its rights or any subdivision of them.'"  *ITOFCA, Inc. v.*

*Mega Trans Logistics, Inc.*, 322 F.3d 928, 935 (7th Cir. 2003) (J. Ripple, concurring).

With an exclusive license, the copyright holder "permits the licensee to use the

protected material for a specific use and further promises that the same permission

will not be given to others."  *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 n.7  (7th Cir.

1996).  A nonexclusive license, on the other hand, does not transfer ownership of

the copyright to the licensee and does not prevent the licensor from granting to

another licensee the exact same right.  *Id.*  The nonexclusive license merely permits

the use of a copyrighted work in a particular manner.  *Id.; see also id.* at 775 n.7 ("'In

its simplest form, a license means only leave to do a thing which the licensor would

otherwise have a right to prevent.'" (quoting *W. Elec. Co. v. Pacent Reproducer*

*Corp.*, 42 F.2d 116, 118 (2d Cir. 1930))).  The possession of a nonexclusive license

to use copyrighted material will defeat a claim of infringement unless the licensee's

use exceeded the scope of its license.  *Shaver,* 74 F.3d at 775 n.8.  Hence, the court

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 12 of 33   Document 24

must determine whether a nonexclusive license of some sort existed regarding the use of the plaintiff's product collection taxonomy and whether Home Depot's use of the plaintiff's copyrighted work exceeded the scope of the nonexclusive license.

### 1. Did a Non-Exclusive License Agreement Exist?

In *Shaver*, the Seventh Circuit held that a nonexclusive license is granted when: (1) the creation of a work is requested by the licensee; (2) the licensor creates and delivers that particular work to the licensee; and (3) the licensor intends that the licensee will copy and distribute the work. *Id.* at 776. It is undisputed that the first two parts of this test are satisfied in this case: Home Depot requested that Edgenet create the taxonomy in question, and Edgenet did so and provided Home Depot access to the creative work. The only remaining question is whether Edgenet intended that Home Depot copy and distribute the taxonomy.

To determine whether the December 2006 Statement of Work evinces an intent on the part of Edgenet to allow Home Depot to use its copyrighted work, the court must look to the language of the agreement. The "normal rules of contract construction are generally applied in construing copyright agreements." *Kennedy,* 187 F.3d at 694; *see also Automation by Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006) (holding that a court must "turn to the relevant state law to interpret" copyright agreements). The law of the state of Delaware, excluding that state's choice of law rules, governs the interpretation of the December 2006 Statement of Work, as the agreement incorporates the choice of law clauses of the

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 13 of 33   Document 24

original Content Services Agreements.[15]  Under Delaware law, "when interpreting a contract, the role of the a court is to effectuate the parties' intent."  *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008).  As such, "clear and unambiguous language" in a contract should be "given its ordinary and usual meaning."  *Id.* (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).

### a.    Conditions Precedent and the License Agreement

The briefs of the parties on the issue of whether Edgenet actually intended to grant a nonexclusive license "are a bit unfocused to say the least."  *Janky v. Lake County Convention & Visitors Bureau*, 576 F.3d 356, 358 (7th Cir. 2009).  The parties seem to conflate two distinct issues:  (1) the issue of whether language in the license agreement conditioned the existence of a license on a given event; and (2) the issue of whether the agreement contained language that allowed for the "forfeiture" of Home Depot's rights that it obtained when it originally acquired the license.  Edgenet contends that Home Depot never obtained a license to use the copyrighted taxonomy because the defendant:  (1) violated the terms of the underlying Content Services Agreement; and (2) breached the terms of the license agreement that allegedly required Home Depot to "immediately" pay the licensing fee to  Edgenet upon the termination of the parties' working relationship.

---

[15] In federal court, the choice of law is determined by the choice of law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941).  In Wisconsin, "parties to a contract may expressly agree that the law of a particular jurisdiction shall control their contractual relations" as long as the parties' choice of law does not violate "important public policies of a state whose law would be applicable if the parties choice of law provision were disregarded."  *Bush v. National Sch. Studios, Inc.*, 139 Wis. 2d 635, 642, 407 N.W.2d 883, 886 (1987).  With no reason to conclude otherwise, the court will apply the law specified in the parties' contractual arrangements, Delaware law.

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 14 of 33   Document 24

Whether such actions are grounds for a *copyright infringement* claim hinges on the distinction in contract law between a condition and a covenant. Generally, "'if the [licensee's] improper conduct constitutes a breach of a covenant undertaken by the [licensee] . . . and if such covenant constitutes an enforceable contractual obligation, then the [licensor] will have a *cause of action for breach of contract,' not copyright infringement*." *Graham v. James*, 144 F.3d 229, 236 (2d Circuit 1998) (citing 3 *Nimmer on Copyright,* § 10.15[A]) (emphasis added). However, "if the nature of a licensee's violation consists of a failure to satisfy a condition to the license . . . it follows that the rights dependant upon satisfaction of such condition have not been effectively licensed, and therefore, any use by the licensee is without authority from the licensor and may therefore, constitute infringement of copyright." *Id.; see also Jacobsen v. Katzer,* 535 F.3d 1373, 1380 (Fed. Cir. 2008) ("Thus, if the terms of [a license] allegedly violated are both covenants and conditions, they may serve to limit the scope of the license and are governed by copyright law . . . if they are merely covenants, by contrast, they are governed by contract law"); *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1198 (7th Cir. 1987) (holding that disputes over compliance with the terms of a licensing agreement are common law breach of contract claims that properly belong before a state court); *Chapman v. Airleaf Publ. & Book Selling*, 292 Fed. Appx. 500, 501 (7th Cir. 2008) (holding that a breach of a covenant in a copyright license requiring payment raised an issue of state contract law and not federal copyright law). Accordingly, the court must determine whether Home Depot's alleged breaches of the Content Services

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 15 of 33   Document 24

Agreement and failure to "immediately" pay Edgenet upon termination of their working relationship constituted a breach of a covenant in the December 2006 Statement of Work or whether Home Depot's actions prevented a condition from occurring necessary to the existence of a license in the first place.

To make such a determination, the court must look to Delaware contract law, specifically to Delaware's determination for when a condition exists in a contract. A condition precedent is "an act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." *Seaford Assocs. Ltd. P'shp v. Subway Real Estate Corp.*, 2003 Del. Ch. LEXIS 58, at *18 n.30 (Del. Ch. May 21, 2003); *see generally Costello Publ'g Co. v. Rotelle,* 670 F.2s 1035, 1045 n.15 (D.C. Cir. 1981) (defining a condition as "any fact or event which qualifies a duty to perform"). Generally, Delaware law affords the presumption that terms of a contract are covenants and not conditions. *Stoltz Realty Co. v. Paul*, 1995 Del. Super. LEXIS 485, at *9 (Super. Ct. Sept. 20, 1995) (holding that condition precedents "are not favored in contract interpretation because of their tendency to work a forfeiture.") ; *see also Commonwealth Constr. Co. v. Cornerstone Fellowship Baptist Church*, 2006 Del. Super. LEXIS 349, at*78 (Del. Super. Aug. 31, 2006)("A condition precedent is not a favorable result when interpreting a contract.") Only "if the language of a contract is plain and unambiguous" in indicating that a condition precedent exists in the contract should the court interpret the contract accordingly. *AES P.R., L.P. v. Alstom Power, Inc.*, 429 F. Supp. 2d 713, 717 (D. Del. 2006) (applying Delaware law).

In this case, the December 2006 Statement of Work contained covenants that Home Depot had to comply with upon the grant of the license; there were no conditions upon the grant of a non-exclusive license to Home Depot. Section one of the license agreement contains "a license grant" clause, providing Home Depot with a "nonexclusive worldwide license to the product collection taxonomy." Furthermore, the license grant states that Home Depot "does own all right, title, interest in and to the display taxonomies." Nothing in the license grant clause itself conditions the existence of the grant on any event. However, Edgenet argues that two separate events upon which Home Depot's license grant was conditioned did not occur, allowing for the infringement cause of action.

Edgenet first contends that Home Depot never "obtained a license" because when the defendant attempted to purchase the license in February of 2008 Home Depot had already breached the terms of the agreement allowing for the license grant by "misusing Edgenet's trade secrets, intellectual property, and copyrighted work to develop and pilot its new HomeDepotLink data system." (Pl's Br. 12). Edgenet cites section six of the December 2006 Statement of Work to show that Home Depot's actions prevented a *condition* from occurring that would allow for the existence of the grant of the license. However, section one of the agreement provided Home Depot with a license as of the date of the agreement, December 18, 2006. Home Depot's attempt to *purchase* a perpetual license in February of 2008 did not negate the fact that Home Depot obtained a license in late 2006. Moreover, section six of the license agreement merely states that "all other provisions of the

[Content Services Agreement], including but not limited to those that require confidentiality and each party to protect the other's intellectual property, specifically apply to the [license agreement]." The plain language of section six does not *condition* Home Depot's obtainment of a license to use the copyrighted taxonomy on the defendant's compliance with the Content Services Agreement: there is no unambiguous language stating that Home Depot will only possess a license upon a given event occurring.[16] *AES P.R., L.P.*, 429 F. at 717. Rather, section six is a covenant made by Home Depot confirming that while the defendant possesses the license from Edgenet it will continue to abide by its duties under the Content Services Agreement, including not disclosing information obtained during the parties' business relationship to third parties. If Home Depot breached that covenant in some way, the remedy lies in state contract law, not federal copyright law.

Edgenet next contends that Home Depot did not obtain a license under the December 2006 Statement of Work, because when Home Depot Canada notified its vendors that it would no longer be using the services of the plaintiff the defendant did not "immediately" pay the plaintiff for the license, as supposedly[17] required by sections two and five of the December 2006 Statement of Work. However, section two of the license agreement is a section devoted to "restrictions" on the nature of the license granted, and section five of the license agreement merely specifies the

---

[16] In fact, the plain language of the agreement indicates that Home Depot's compliance with the Content Services Agreement was to coincide with the defendant's possession of a license to use the defendant's copyright work per section one of the December 2006 Statement of Work .

[17] The court uses the word "supposedly" for the reasons discussed in footnote 23.

-18-

procedure Home Depot had to follow for cancelling the license. Neither section states that obtaining the license itself is conditioned on any event occurring. Rather, the section only places a restriction on when the license is a "no cost license." The license grant itself, contained in section one of the agreement, unambiguously provides Home Depot with a license to use the taxonomies as of the date of the license. Because Delaware law requires "plain and unambiguous" language for a condition precedent to exist, and because none exists in the December 2006 Statement of Work, the court can conclude that Home Depot obtained a license to use Edgenet's taxonomies on December 18, 2006.[18] Edgenet's complaints about Home Depot failing to immediately pay its licensing fees is a contractual dispute, not a copyright dispute. *See, e.g., J.D. Edwards & Co. v. SNE Enters.*, No. 95-C-1601, 1995 U.S. Dist. LEXIS 17329, at *10 (N.D. Ill. Nov. 8, 1995) ("A contract dispute claim normally concerns a failure of either the licensee or licensor to comply with the terms of the licensing agreement (e.g., *failure to pay the licensing fees*; *failure to cease production upon termination of the agreement, etc.*)") (emphasis added).

### b. Rescission of the License Agreement

Edgenet seems[19] to contend, in the alternative, that even if the above referenced sections of the license agreement are covenants, as opposed to

---

[18] Moreover, for the reasons stated later in this order, the court ultimately concludes that Home Depot continues to possess the perpetual nonexclusive license to use Edgenet's taxonomies, as the defendant properly tendered payment for the license in February of 2009, the only condition that Home Depot had to fulfill in order to obtain a license after the termination of the parties' working relationship. The parties make no argument as to why Edgenet failing to accept Home Depot's payment negates the purchase of the license, and the court will treat Home Depot as having possession of the license in question to date.

[19] The court uses the term "seems" because Edgenet's briefs are anything but clear on the argument the company is trying to make.

conditions precedent, that Home Depot *materially* breached those covenants, which, in turn, could create a cause of action for a claim of copyright infringement. Copyright law dictates that "a breach of a covenant [in a license agreement] will give rise to a reversion of rights to the grantor only if such breach is *so material* as to create a right of rescission in the grantor" as dictated by the state law controlling the interpretation of the agreement, allowing for a copyright infringement action for acts taken by the defendant after the license has been rescinded. 3-10 Nimmer on Copyright § 10.15; *see also Costello Pub. Co. v. Rotelle*, 670 F.2d 1035, 1043 (D.C. Cir. 1981) ("[B]reach of the licensing agreement . . . . constitute[s] copyright infringement if the breach were material."); *Graham,* 144 F.3d at 237 (holding that a material breach of a covenant in a license agreement allows the licensor to "rescind the license and hold the licensee liable for infringement for uses of the work thereafter.")

Under Delaware's law of contracts, a non-breaching party may be able to obtain the right to rescind or terminate a contract upon the breach of the agreement. *Liafail, Inc. v. Learning 2000*, No. 01-599 GMS, 2002 U.S. Dist. LEXIS 22620, at *8 (D. Del. Nov. 25, 2002) (applying Delaware law). However, "not all breaches" will authorize the other party to exercise its right to rescind the contract. To justify termination, "it is necessary that the failure of performance on the part of the other go to the substance of the contract." *Saienni v. G & C Capital Group*, 96C-07-151-JOH, 1997 Del. Super. LEXIS 186, at *6 (Super. Ct. May 1, 1997) (internal citations omitted). Only "substantial failure to live up to the material terms

-20-

of a valid contract nullifies that contract." *Demarie v. Neff,* No. 2077-S , 2005 Del. Ch. LEXIS 5, at *14 (Jan. 12, 2005). The right of rescission can only follow from the default by one party of its obligations under a contract coupled with the defaulting party announcing its "intention to not perform the contract" or its "insistence" upon creating a new contract. *Johnson Forge Co. v. Leonard*, 19 Del. 342, 350 (1902); *Sheehan v. Hepburn*, 37 Del. Ch. 90, 94 (1958) ("An outright refused [sic] of one party to a contract to perform the contract or its essentials constitutes such a repudiation as to entitle the other contracting party to treat the contract as rescinded.") Finally, the failure of a party to perform his or her part of a contract does not automatically rescind the agreement. The non-breaching party must manifest an intention to rescind the contract within a reasonable period of time. *SLMSoft.Com, Inc. v. Cross Country Bank*, 2003 Del. Super. LEXIS 112, at *11 (Del. Super. Apr. 2, 2003) (holding a party who asserts that a material breach occurred but also fails to void the contract is estopped from later denying the validity of the contract because the non-breaching party cannot "pick and choose" the periods for which a contract can apply); *see also Demarie,* 2005 Del. Ch. LEXIS 5, at *16-17 (holding that the nonbreaching party must elect to either "preserve or accept the benefits of a contract" or "assert that the contract is void and unenforceable"); *Leech v. Husbands*, 34 Del. 362, 369 (Super. Ct. 1930) (holding that the right to rescind the contract must occur within a "reasonable length" of time after the discovery of the facts warranting the rescission); *see generally* 17A Am Jur 2d CONTRACTS § 568 ("The failure of a party to perform his or her part of a contract does not per se

rescind it; the other party must manifest an intention to rescind. Contract rescission requires, at a minimum, that the party exercising a right to rescind notify the other party and demonstrate an unconditional willingness to return to the other party both the consideration that was given and any benefits received.")  As such, the court will examine whether Home Depot's alleged breaches of the two respective clauses of the license agreement, coupled with Edgenet's reactions to the defendant's behavior, provided for the rescission of the license agreement, in turn, allowing for a claim for copyright infringement.

Initially, the court will not discuss the doctrine of material breach and rescission as it relates to Home Depot's compliance with section six of the December 2006 Statement of Work in this part of the court's order.  Edgenet's assertions that Home Depot's "misuse" of Edgenet's "trade secrets, intellectual property, and copyrighted work" amount to a "material breach" of section six of the license agreement, which incorporates the Content Services Agreement's terms into the Statement of Work, is all but annoyingly vague, perhaps confirming the weakness of the plaintiff's argument.  The court will address this argument when it discusses whether Home Depot's use of the plaintiff's copyrighted product collection taxonomy exceeded the scope of the license because the argument about Home Depot materially breaching section six of the license agreement begs such a discussion.  If a covenant by Home Depot assured that it would not "misuse" Edgenet's copyrighted work, that misuse would necessarily follow from exceeding

the scope of the license, as a "use" of the work within the scope of the license would be legitimate.

Moreover, Home Depot's failure to provide the fee of $100,000 until February of 2009, allegedly violating sections two and five of the December 2006 Statement of Work, did not rescind the license agreement. Even if the court assumes that Home Depot materially breached the license agreement by not immediately paying Edgenet the licensing fee in late January of 2008, that only means that Edgenet was *entitled* to the right of rescission in 2008. Edgenet, by failing to exercise its right to cancel the contract and by continuing to provide Home Depot with access and updates to its taxonomies well into late 2008, kept the license agreement alive. *See Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir. 1997) ("Such a breach would do no more than entitle JMI to rescind the agreement and revoke its permission to play the song in the future, actions it did not take during the relevant period. One party's breach does not automatically cause recision of a bilateral contract"); *Graham,* 144 F.3d at 237-38 ("Even assuming Graham materially breached the licensing agreement and that James was entitled to rescission, such rescission did not occur automatically without some affirmative steps on James's part").

In addition, Edgenet has not alleged sufficient factual matter, accepted as true, to state a claim that a "material breach" of the licensing agreement has occurred. Edgenet argues that Home Depot materially breached sections two and five of the December 2006 Statement of Work by not tendering a payment of the licensing fee

-23-

"immediately" when Home Depot Canada told its Canadian suppliers that it would no longer be using Edgenet's services in January of 2008. However, the plain and unambiguous meaning of section two of the license agreement indicates that only if Home Depot ended the relationship with Edgenet, such that the plaintiff "ceased"[20] "to be" used for Home Depot's data pool in the United States and Canadian stores, would Home Depot have the option of paying the $100,000 licensing fee. Edgenet, assuming all of the plaintiff's allegations to be true, has only stated that Home Depot Canada "notified" its vendors that it would no longer use Edgenet's services. Edgenet has never stated[21] that its relationship with Home Depot actually "ceased" to exist in January of 2008, a condition that was required for the license fee to be implemented.[22] Moreover, at best, Edgenet's allegations indicate that Home Depot failed to use Edgenet for its needs in its Canadian stores, a far cry from the cessation of Edgenet's relationship with Home Depot in both the United States and Canadian stores, a condition precedent to the"immediacy" requirement for payment of the license fee that Edgenet interprets the licensing agreement to mandate.

Finally, even if the court assumes that the December 2006 Statement of Work requires "immediate" payment of a licensing fee upon the termination of the

---

[20] The ordinary meaning of the word "cease" is to completely stop or come to an end. *See Black's Law Dictionary* 282 (4th ed. 1968) ("to stop; to become extinct; to pass away; to come to an end")

[21] Moreover, the court notes that Home Depot's supposed termination of its relationship with Edgenet in January of 2008 was not consequential enough to warrant mention in Edgenet's original complaint to the court.

[22] Edgenet invites the court to take the logical leap that Home Depot's notification to its suppliers constituted the cessation of its relationship with the plaintiff. The court in reviewing a motion to dismiss, however, need not credit the "legal conclusions or unsupported conclusions of facts" provided by Edgenet.

relationship between Edgenet and Home Depot,[23] and that such a termination occurred in January of 2008, the court cannot conclude that Home Depot's belated offer of the license fee in February of 2009 was a "failure of performance" that went to "the substance of the contract," constituting a *material* breach of the agreement. *Saienni*, 1997 Del. Super. LEXIS 186, at *6. Here, Home Depot provided a late payment to the plaintiff, but a late payment is typically not viewed as a "material" breach of a contract under Delaware law. *See, e.g., Word v. Johnson*, C.A. No. 1004-N , 2005 Del. Ch. LEXIS 168, at *11 (Oct. 28, 2005) ("But the assumption agreement is silent on this subject, and the court cannot imply any agreement between Johnson and Word that a mere late payment was to be treated as a material breach of the contract.") Nowhere did Home Depot announce its "intention to not perform" its obligations under the license agreement or did it "insist" upon

---

[23] Having made this assumption, the court cannot agree with Edgenet that section five of the December 2006 Statement of Work requires payment must be "immediate" upon the termination of the parties' business arrangement. Section five's immediacy requirement modifies the steps Home Depot has to take after the defendant terminated its relationship with Edgenet and did not opt to purchase the license, such as the cessation of the use of the product collection taxonomy. The immediacy requirement does not modify the timing of when the fee is paid. The court, when interpreting the contract, must adhere to the clear language of the contract and cannot use creative interpretations to create ambiguity where none exists. *McKnight v. USAA Cas. Ins. Co*., 871 A.2d 446, 448 (Del. Super. Ct. 2005). Given that the contract is silent on the time when Home Depot needed to pay the necessary license fee to the defendants, Delaware law dictates that courts can assume that the parties contemplated a "reasonable time period" for performance of contract obligations. *Henkel Corp. v. Innovative Brands Holdings, LLC*, C.A. No. 3663-VCN, 2008 Del. Ch. LEXIS 122, at *7 (Del. Ch. Aug. 26, 2008) ("[W]ith contracts lacking a time for performance generally, the Court will be required to determine a 'reasonable' period for performance"); *see also Bundesen v. Beck*, No. 11,347, 1992 Del. Ch. LEXIS 147, at *5-6 (Del. Ch. June 23, 1992) (holding that, unless the parties intentionally omit a time period for performance, a court may add some reasonable time frame for performance to the agreement); *cf. Gluckman v. Holzman*, 30 Del. Ch. 60, 53 A. 2d 246, 249 (Del. Ch. 1947) (relying on the fact that the parties were intentionally silent on the time period for performance in refusing to find an implied reasonable time period in the contract). The question of what is a reasonable period of time for which an act must occur is dependent on the factual context of a dispute and cannot be resolved by the court at the motion to dismiss stage. However, for the reasons stated in the body of this order, a material breach of the implied term, no matter how short of a time period that is implied for which Home Depot had to pay the licensing fee, did not occur in this case.

creating a new license agreement, warranting the rescission of the contract. *Johnson Forge Co.,* 19 Del. at 350. Ultimately, Edgenet has not stated a claim for a material breach of the licensing agreement that is tantamount to infringement of its copyrighted taxonomy. Instead, Edgenet has, at best, stated a breach of contract claim for Home Depot's failure to timely comply with the contours of the license agreement, a claim based on state law that this court can only entertain under its supplemental jurisdiction.

### 2. Did Home Depot's use of the copyrighted taxonomy exceed the scope of the license agreement?

As discussed earlier, the mere fact that Home Depot acquired a license to use Edgenet's product collection taxonomies does not mean that Home Depot has absolved itself of the copyright infringement claim. A licensee can still infringe the owner's copyright if the licensee's use "exceeds the scope of the license." *Shaver,* 74 F.3d at 775 n.8. Initially, the court notes that the license grant itself, as provided in section one of the license agreement, is quite broad, in that it provides Home Depot with "all right, title, and interest in and to" Edgenet's display taxonomies. The only restrictions on the license, contained in section two of the licensing agreement, pertain to the fees required to possess the license, discussed earlier in this order. Edgenet makes four arguments for why Home Depot's use of its copyrighted taxonomy exceeded the scope of the license agreement, none of which the court finds persuasive.

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 26 of 33   Document 24

First, Edgenet contends that Home Depot only acquired the license in February of 2009, and, as such, the license's protection only extends to uses of the copyright after that time, allowing a copyright infringement claim to exist for actions taken by the defendant prior to the date in question. However, as explained earlier, Edgenet ignores the fact that the license agreement did not condition the existence of the license on the payment of a fee. The license was granted in section one of the December 2006 Statement of Work without any conditions. As such, Home Depot's use of Edgenet's copyrighted work in 2008 was legitimate because Home Depot had acquired the necessary license to use the copyrighted product collection taxonomy in December of 2006.

Second, Edgenet argues that the license provided in the December 2006 Statement of Work did not encompass all of Edgenet's copyrighted material but rather only covered Edgenet's "taxonomy." The plaintiff argues that the license did not include Edgenet's "copyrighted attributes," the "characteristics, properties, qualities, and values" associated with a particular product organized in the taxonomy (Pl.'s Brief 17), and, as such, Home Depot's use of Edgenet's attributes in developing HomeDepotLink infringed upon the plaintiff's copyright. However, the certificate of registration from the United States Copyright Office that the plaintiff submitted indicates that information such as the "text obtained from vendors" is excluded from the scope of Edgenet's copyright. Moreover, the original Content Services Agreement, in section 8.1, prohibits Edgenet from claiming a property right in the attributes associated with each product, in that the agreement states that

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 27 of 33   Document 24

Home Depot retains "all right, title, and interest" in the "data" provided by its vendors and in the "content," data that has been enriched by the plaintiff's services. While Edgenet asserts that the product attributes include not only the features and values of a particular product but also "the questions and format" of potential answers posed about each attribute within the taxonomy (Pl's Brief 17), Edgenet's argument is foreclosed by the language of the Content Services Agreement that prohibits Edgenet from claiming ownership in data enriched by their services. Moreover, it belies logic that the "questions" that Edgenet poses about the data submitted by Home Depot's suppliers are part of the products' "attributes." Rather, such questions appear to be part and parcel of the plaintiff's copyrighted product collection taxonomy, which the plaintiff defines as the "hierarchal classification system" used to "organize products into various categories and subcategories," as the questions posed about each item of data entails how the product data is organized. (Pl's Br. 5). The court's conclusion is bolstered by the plaintiff's own complaint, which distinguishes between the "questions" Edgenet's taxonomy asks of the suppliers and the "product attributes," in that the questions Edgenet poses are the means by which the product attributes are organized. *See* Pl's Complaint ¶ 22 ("To identify and collect product *attributes*, Edgenet decides not only the *questions to ask* a supplier about each product, but the *appropriate potential answers* the supplier should provide, as well as the particular format the answers must take") (emphasis added). As Edgenet does not dispute, at least for the purposes of the present argument, that Home Depot's license extended to the use of Edgenet's

product "taxonomies," the defendant's alleged use of the copyrighted work would necessarily include the questions and answers Edgenet crafted regarding the data submitted by the defendant's vendors, allowing the court to conclude that Home Depot complied with the scope of their license.[24]

Next, Edgenet argues that Home Depot's use of the copyrighted taxonomy exceeded the scope of the license in that the December 2006 Statement of Work was limited to the 2006 version of the product collection taxonomy, such that factual questions remain as to whether Home Depot infringed upon Edgenet's copyright by using other versions of the taxonomy. However, Edgenet can point to no language in the license agreement that restricts the license to the 2006 version of the product collection taxonomy. To the contrary, the December 2006 Statement of Work states that Home Depot owns *"all* right, title and interest in and to the display *taxonomies*," indicating that the agreement contemplated the defendant acquiring, through the license, multiple taxonomies with the entirety of the rights and interests associated with using the taxonomies. At best for Edgenet, the license is silent as to whether Home Depot could use future versions of the product collection taxonomy, but the court will not limit the terms of the license or "rewrite contractual language covering particular topics just because one party failed to extract as complete a range of

---

[24] Edgenet asserts that Home Depot's opening brief "ignored" Edgenet's allegations about the distinction between a "taxonomy" and an "attribute," and argues, citing *Giddings v. Principal Fin. Group, Inc.,* No. 07-CV-370, 2008 WL 2002652, at *3 (E.D. Wis. May 6, 2008), that "arguments raised for the first time in a reply brief . . . are deemed waived." While the court does not disagree with the legal principle raised by the plaintiff, the defendant did argue in its initial brief to the court that the copyright protection obtained by Edgenet did not extend to the product attributes. *See* Def's Br. 5-6 ("[T]he product data that suppliers provide to Edgenet for delivery to Home Depot is the property of suppliers and Home Depot—*not* Edgenet.")

Case 2:09-cv-00747-JPS   Filed 01/12/10   Page 29 of 33   Document 24

protections as it, after the fact, claims to have desired during the negotiation process." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1033 (Del. Ch. 2006). Moreover, even if the license was limited to the 2006 version of the product collection taxonomy, Edgenet has not plead sufficient factual material to indicate that material changes occurred with the taxonomy between 2006 and 2008, such that Home Depot's use of the copyrighted work exceeded the scope of the license.

Finally, Edgenet contends that the scope of the licensing agreement was limited to the SAP Core Retail Project and was to be used for no other purpose. However, the language of the license agreement is "plain and clear on its face." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 289 (Del. 2001). Section one of the December 2006 Statement of Work states that the license being granted by the agreement is a "nonexclusive worldwide license to the product collection taxonomy to be used *initially* for [the] SAP Core Retail Project" (emphasis added). Quite to the contrary of what Edgenet asserts, the word "initially" in the license grant indicates that the license provided by the December 2006 Statement of Work was not intended exclusively for use during the SAP Core Retail Project, as "initially" means "in the first place" or "at the beginning." *Webster's Third New International Dictionary Unabridged* 1164 (1981). Instead, the license grant contemplated future uses by Home Depot of Edgenet's product collection taxonomy. While Edgenet urges the court to look to the declaration of the company's Chief Technology and Data Officer to support the contention that the license was meant to apply exclusively to the SAP

Core Retail Project, the court cannot look to extrinsic evidence to determine the meaning of a contract's terms when the agreement's language is unambiguous or "plain and clear on its face." *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997). The mere fact that Edgenet disagrees with Home Depot on the meaning of section one of the license grant does render the license's language ambiguous. Here, the word "initially," as used in the license, is not "fairly susceptible to different interpretations," and the court must conclude that Home Depot's license was not limited for use to the SAP Core Retail Project. *Id.*

In short, the court remains unpersuaded by Edgenet's various arguments for why Home Depot's use of the plaintiff's copyrighted work exceeded the scope of the copyright license. The December 2006 Statement of Work provided Home Depot with a license that broadly provided the defendant with all "rights, title, and interest in" the display taxonomies. Given that Edgenet raises no other arguments as to why Home Depot's use of the product collection taxonomies exceeded the scope of the license the defendant obtained, the court can conclude that Home Depot's use of the plaintiff's copyrighted work did not infringe upon Edgenet's rights. As such, the court

must dismiss the first count in Edgenet's complaint for copyright infringement with prejudice[25] for failure to state a claim upon which relief can be granted.

## B.    The Remaining Counts (Counts II - VII)

The remaining counts in Edgenet's complaint against the defendants are not based on federal law, but rather stem from state statutory or state common law.  The only basis for the court to exercise jurisdiction over these remaining state law claims is the court's supplemental jurisdiction as provided by 28 U.S.C. § 1367(a).[26]  As a general rule, when all federal claims have been dismissed prior to trial and only pendant claims remain, "the federal court should relinquish jurisdiction over the remaining pendant state claims."  *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial

---

[25] Edgenet argues that Count I should not be dismissed "with prejudice."  Generally, courts grant leave to amend a complaint after granting a motion to dismiss the original complaint under Fed. R. Civ. P. 12(b).  *See* Fed. R. Civ. P. 15(a) (providing that leave to amend a complaint should be freely given when justice so requires).  However, a district court may deny leave to amend for "undue delay, bad faith, dilatory motive, prejudice, or futility."  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 740 (7th Cir. 2007).  The opportunity to amend a complaint is futile if "the complaint, as amended, would fail to state a claim upon which relief could be granted."  *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997).  As discussed above, Edgenet has not stated a claim for relief for copyright infringement.  The license between Home Depot and Edgenet allowing Home Depot to use the plaintiff's copyrighted work establishes that there are no facts that Edgenet could plead that could form the basis of a complaint that would survive a motion to dismiss.  As such, any amendment to claim one would be a futile act, and the court must dismiss count one "with prejudice."

[26] Diversity jurisdiction does not exist in this case.  Federal diversity jurisdiction, as granted by 28 U.S.C. § 1332(c) , requires "complete diversity" between all plaintiffs and all defendants – that is, each plaintiff must be a citizen of a different state than each of the defendants.  *Lincoln Property Co. v. Roche,* 546 U.S. 81, 89 (2005).  "[A] corporation's citizenship derives, for diversity jurisdiction purposes, from its State of incorporation and principal place of business."  *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 318 (2006).  Here, complete diversity is lacking with all of the state law claims: both Edgenet and Home Depot, the parties involved in every claim, are incorporated in Delaware.  (Comp. ¶¶ 7-8).

economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims") (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)). However, there are three exceptions to this general rule: (1) when the refilling of the state claims is barred by the statute of limitations; (2) where substantial judicial resources have already been expended on the state claims; and (3) when it is clearly apparent how the state claim is to be decided. *Williams*, 509 F.3d at 404 . Having said that, Edgenet does not argue and the court cannot conclude that any of the three exceptions apply in this case. Given the early stage of this litigation, the court finds that dismissing the pendant claims without prejudice such that the plaintiff can seek remedy in a state court proceeding is the most prudent course of action.

Accordingly,

**IT IS ORDERED** that the defendants' motion to dismiss (Docket #15) be and the same is hereby **GRANTED; Count I** of the complaint be and the same is hereby **dismissed with prejudice** and **Counts II, III, IV, V, VI, and VII** be and the same are hereby **dismissed without prejudice.**

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 12th day of January, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge